Good morning, Your Honor. My name is Ken Gifford. I represent Pablo Cobb in this appeal. And I'd like to read you a statement that was made by President Truman in 1952. He said, in 1952 December, copies of the U.S. Constitution, the Bill of Rights, and the Declaration of Independence were moved to the rotunda in the National Archives. And President Truman said, Only as these documents are reflected in the thoughts and acts of Americans can they remain symbols of power that can move the world. That power is our faith in human liberty. Fourteen years later, in the Miranda decision, that court was concerned about what it turned to be abuses of police power by the states. And the court mused that these same rights had been reduced to mere words. And that's essentially where we are right now in this case. It's a Miranda case. It's a Fifth Amendment issue. It's a Sixth Amendment issue. And it's, in my brief, in looking at this, it forced me to do one thing, which was reread Miranda, which is a very interesting decision. And Miranda is interesting also because the court went on to discuss the evolution of the law, and it also looked at what law enforcement was doing, and those things which had reduced those rights to mere words. Subsequent to Miranda, we're looking at the conduct of law enforcement. And subsequent courts have, I believe it was the Ennis decision, said that we have conduct by law enforcement which isn't necessarily interrogation, but it's the functional equivalent of interrogation. And, unfortunately, what's happened is if we really analyze these cases post-Miranda up to today's date, we find that law enforcement and the states seem to be in a process of figuring out ways to go around Miranda to get that confession by the defendant. One thing that's kind of critical to an examination in a case like this is we have to look at when we look at is that a voluntary confession, we have to look at the totality. I think it would be helpful if you got to this case. Pardon me, Your Honor? Let's talk about this case. Yes. That's what we're going to talk about. All right. So far we haven't. Excuse me? So far we haven't. That was my lead-up, Your Honor. Okay. We have to look at the totality of the circumstances. And we can look at the abridgment of these rights as occurred in this case. Basically, I mean, if you want to attack a chicken coop, you can take a chicken here, a chicken there. Eventually they're all gone. In this case, initially, Mr. Cobb was related to Miranda Rights. He made a statement, various statements, but they were not inculpatory statements. And later on he asserted his right. He said he did not want to talk anymore. But that's all sort of water under the bridge because he didn't make any statements at that point. That's correct. But it also, again, looking at the ---- So basically, if I can just direct this so we can get something done, it seems to me that the two major issues are the lawyer issue and the use of the girlfriend. And the use of the girlfriend, frankly, is the most troubling to me. I think the problem is that the finding is that he didn't use the girlfriend, that the girlfriend just sort of showed up on her own. And he's just bound by that finding. Okay. Your Honor, if the girlfriend had just shown up on her own, then I don't think it would be sort of like I think it was Murrow v. Arizona where the officer sat passively by and listened to the wife talk to the ---- eventually talk the husband into the confession. In here, it was obvious, or at least from our perspective, that the officer knew exactly what the girlfriend was doing. She could hear the conversation between he and the officer and Mr. Cobb while they were in. And it was obvious that he could hear everything that was happening. One of the things we brought up was that when Mr. Cobb first was confronted by her, he told her that basically she told on him. And he got very violent. He started throwing things around, and immediately the officer was in that room. And he knew they were listening to everything he said. So they were, in fact, listening to everything he said. That's true. That's correct, Your Honor. And he eventually left, and the girlfriend was there. One of the things that Miranda was looking at was that in the police techniques, you want to isolate the person. And even putting the girlfriend in there was not isolating. It was isolating Mr. Cobb because it became apparent that she was not giving him any support. If you look at the transcript, the only person who might have been giving him any support First of all, do you think that you have to prove that she's an agent or what? What is the legal standard in terms of whether her interaction with him is ascribable to the government? Okay. It would be easy if you could prove that she was the agent of the government. Then everything she did would be attributable to the government. In this case, we have someone who is kind of a quasi-agent because the officer knew exactly what she was doing by monitoring. And he was feeding by her testimony at the suppression motion trial. She had indicated what she had been told, and she was giving him information. The officer gave her information, and she was using that. Now, did she testify that she was told to go in there and persuade him to talk? No. She was given information while she testified that she was told by the officer that he should talk. There is a possibility that she could be tried as a, I think it was an accessory after the fact. It could be a number of years. I believe her testimony was that she would spend time in jail as a pregnant woman. Was there a finding of fact about whether this was said or wasn't said? The court indicated that she testified to that, but they gave all the belief to the officer. All right. So for our purposes, unless it's clearly erroneous, we're stuck with the fact, the notion that they didn't say that. That's correct. But in a confession issue, Your Honor, I believe the court looks at all the facts de novo. So the court doesn't do that when there's an actual conflict in the testimony. Okay. Well, we have the transcript from the proceedings that occurred in the interrogation room. Right. So the court can look at that. I'm sorry, not that, but in terms of what preceded it. Let me tell you one thing that I am bothered by that didn't seem to be emphasized in the briefs or the arguments, and that is that as to the question of whether he offered in the end to speak without a lawyer, he said many times when he was talking to her that he only wanted to speak with a lawyer, and he was overheard. That's correct, Your Honor. He kept saying time after time, I want my attorney. I want my attorney. She had said a couple of times that, well, we're going to get Dennis. We're going to get Dennis. Who's Dennis? Is he the lawyer? The presumption from looking at the testimony is that Dennis was an attorney that she knew, but she kept telling him, we're going to get Dennis. We'll get Dennis. And then after he'd make the comments, I need an attorney, I need an attorney, it was also, but you need to talk. You need to talk. So rather than basically reinforcing him, and again, Miranda. Well, she certainly was. The question is, is the government, and no doubt she'd induced him to talk, and the question is, is the government responsible? And she knew he wanted a lawyer. Is the government responsible for any of that? Okay. The government is responsible because the government put her in that situation. The officer, again, he was sitting outside monitoring all these things as they were occurring. Then he would pop in and out when things appeared to be bogging down. What was the closest case you had that supports your position on this issue? I'd like to say Henry, but Henry, the officers confessed. They admitted that. Yeah, we went out deliberately to violate his rights. Moral is in substance as close except the fact that, I mean, the court did find that the wife was not the agent of law enforcement, but what's distinguishable about moral is that the wife came in after the officer was already in there, and there was, at least from the brief on the case, there was no interaction between the officer and the wife as she was querying her husband and eventually got him to confess. So there was in essence no interaction. What distinguishes moral from this case is that we do have the interaction of the officer and the girlfriend during the course of this interrogation. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. I'm John McLean, Deputy Attorney General, appearing on behalf of the Respondent. Your Honors, I think it's important to keep in context the case that we have before us. It's a habeas case. It's a case under the AEDPA. It's a case in which there's deference to the State court decisions and in which Petitioner has the burden to establish that the State court's decision was contrary to or an unreasonable application in the United States Supreme Court precedent. There's a reference to that in Appellant's opening brief, but then there's never any discussion of that standard of review that this Court's here to apply. And I think that the District Court, this Court's reviewing de novo the District Court's ruling, but I think the District Court's ruling is a correct application of the AEDPA standard. The whole episode with the girlfriend seems to me to be a wink-and-nod episode. I mean, in other words, the police first told her things that weren't true in terms of what other people were saying, also at least told her that she was in some jeopardy herself, whether they specifically threatened her with arrest is another question. You can stop me if any of what I'm saying is wrong, but these are my understanding of the facts. And also, and then allowed her to go in and talk to this guy, at least allowed her, whether they gave her any directions is another question. And then listened to everything they said. And so she – they provided her with every motive in her self-interest, not his, to do what they wanted her to do, right? And then they facilitated her doing it, and then they listened to her doing it. And in fact – and then – and this is the part that bothers me the most. They heard – in the course of doing that, they heard him say several different times, I'll only do it with a lawyer. They overheard that, and then when they came out and he said something about a lawyer that's said not to be good enough, but that's out of context, because they've already heard him say five times, I only want to do this with a lawyer. And they heard that. I'd make several points, Your Honor. I think that there – certainly the police heard some of it. I don't think we – there's any – I don't think it's firmly established that they heard all of it or that they were listening all the time. But I think that's a minor point. But as the district court points out, the trial court made findings that there was no evidence that she was sent in there to elicit statements or that they told her what to say. The trial court – Well, that's why I'm characterizing it as a weakening nod. They – there's a finding that they didn't say go in there again to talk, but they provided her with both the motive and the opportunity to do it. The trial court made a second finding that she was allowed to do – allowed to enter the room without police involvement. Now, again – But it wasn't without police involvement because they heard everything she was saying or they heard – they were able to hear everything she was saying. But they were not – but they were not instructing on her on what to say. She was in there. She was talking to him. And – and then most of the court – But wasn't there an implicit message that if you don't get him to talk, you're going to be in trouble? I think that you have to – you have to ultimately come to the point that that conversation ends, the detective goes in there. Mr. Cobb asked the question, may I – can I speak to you with a lawyer? Paraphrasing. But can I speak to you – he says, I want to talk to you. Can I talk to you? Well, that's standing alone under the standards of indulging a lawyer wouldn't But what about the fact that he had said – and I am willing to assume in an overheard conversation, because we know they were overhearing some of the – they were able to and did overhear at least a good part of the conversation. Why would they stop? Or we could send it back for a hearing on that question. But assuming they heard him, okay, and he said five different times, I want the lawyer, I want the lawyer, I want the lawyer. Then what? Then the officer goes in, he asks this question about can I talk to you with a lawyer present. I mean, I think you can infer that's what he wants to do. He wants to talk to the police with a lawyer present. He's told correctly that that won't happen. If he asks to speak to a lawyer, this interrogation is going to end, as it should, and he's already – he had already been arrested, you're going to be taken across the street. And he says, then I want to talk to you. Miranda writes, or read to him again, writes to the main Senate, writes to counsel, and he says, you know, okay, I want to talk. So – Which did him absolutely no good, of course, and couldn't have, in terms of not getting arrested. So that also is a sort of phony promise, because it was an implication that if you talk to me, we won't take you across the street and book you. But, of course, that wasn't true. It wasn't a – he had already been told. He had been told before she went in there that he was being arrested. So what does it mean to say – So there's – Right. So what does it mean to – There was no promise or – he had already been arrested. Right. So what does it mean to say I'm not going to give you a chance to talk if you have a lawyer? I think he's just answering the question. He's not – I don't think he's promising anything. He's answering the question. May I speak to you with a lawyer present? And the officer is correctly and honestly answering if – you know, there's no promise. There's no offer of leniency. If you want to speak to a lawyer, you can answer it now, and I'm going to go to you. So is there a case law that says that that's all right, that they can – that if they were going to interrogate him otherwise, they can say, but if you have a lawyer, we won't talk to you? I think the officer had been asked the question. I think it would have been – I'm not sure what the officer – what else the officer could have said. The officer could have said, yes, you can see a lawyer, and then if you want to talk to us, you can talk to us. What – essentially what he's saying is I'm going to burn your right to counsel because there's this beneficial thing you could do, but if you ask to see a lawyer first, I'm not going to do it. But the question was, the question was, may I speak to you with a lawyer present? In other words, that's that – he wasn't just asking for counsel. He was conditional. May I speak to you with a lawyer present? And the officer correctly and appropriately answered, if you want to speak to a lawyer, it ends right here. And that's a true and correct statement. I'm not – at least I don't know case law saying that that's appropriate. Can you tell me what it is? I mean, I understand that to be saying if you consult a lawyer, I won't talk to you. I mean, you cannot – we're going to interrogate you, but we will not interrogate you if you speak to a lawyer. I can't point to case law saying that's appropriate, Your Honor. I just don't know what answered the other. This was an honest answer. I think that was an honest answer, and I don't know why it would – why that would be problematic. I suppose the true answer would be that the lawyer won't let you talk to him. But that isn't what he said. Your Honors, unless you have any other questions, I'll submit it. Thank you, Your Honor. The case just argued is submitted for decision.
judges: Schroeder, Tashima, Berzon